IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARISCO, LTD., a Hawaii Corporation, | ) ) ) | CIVIL NO. 18-00211 SOM/RT |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S |
| vs. | ) ) | MOTION FOR JUDGMENT ON THE PLEADINGS (ECF NO. 78) AND |
| GL ENGINEERING & CONSTRUCTION PTE., LTD, a Singapore Corporation; | ) ) ) | MOTION FOR SUMMARY JUDGMENT (ECF NO. 76) |
| LIM SING TIAN; and | ) ) ) | |
| RAYMOND GAN, | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS (ECF NO. 78)
AND MOTION FOR SUMMARY JUDGMENT (ECF NO. 76)**

I.       INTRODUCTION.

The Complaint in this matter alleges that Plaintiff Marisco, Ltd., hired Defendant GL Engineering & Construction, Pte., Ltd. ("GLEC"), to construct and deliver a floating dry dock. Marisco alleges that the construction company's principals, Defendants Lim Sing Tian and Raymond Gan, misrepresented their experience and ability with respect to constructing dry docks. Marisco says GLEC delivered the dry dock late, unfinished, and not according to specifications.

On February 18, 2020, GLEC filed the Counterclaim at issue on these motions. Tian and Gan are not Counterclaim Plaintiffs. GLEC alleges that Marisco failed to pay the full

amount due under their agreement and failed to pay for change orders.  *See* ECF No. 65-1.  Before the court are two motions filed by Marisco challenging the Counterclaim.

In its first motion, Marisco initially seeks judgment on the pleadings with respect to Count II of the Counterclaim, which alleges a breach of the implied covenant of good faith and fair dealing.  At the hearing, the parties agreed that Count II is unnecessary, provided it is read as already part of the breach of contract claim asserted in Count I.  Accordingly, to the extent Marisco seeks judgment on the pleadings with respect to Count II, its motion is granted with the understanding that GLEC may proceed with the underlying claim asserted in Count II as part of the breach of contract claim asserted in Count I.

The first motion also seeks judgment on the pleadings with respect to Count III of the Counterclaim, which asserts unjust enrichment, arguing that GLEC cannot maintain an equitable claim when there is an adequate remedy at law.  This court denies this part of the motion because GLEC may plead alternative claims.  At this point, it is not clear that GLEC does have an adequate remedy at law.  Of course, GLEC may not recover duplicative damages, and the equitable unjust enrichment claim is viable only if there is no adequate remedy at law.

In its second motion, Marisco moves to compel GLEC to arbitrate the matters raised in the Counterclaim.  This court

agrees that GLEC must arbitrate Count I of the Counterclaim, including the contractual breach of good faith and fair dealing claim that is now subsumed within Count I, to the extent Count I relates to Change Order #s 1, 9, 10, and 11.  The court therefore refers that portion of Count I to arbitration.  However, because the court does not have before it evidence of an agreement that GLEC must arbitrate its remaining breach of contract claim that Marisco failed to pay $148,400 due on the final progress payment, that portion of Count I remains with this court.  The entirety of the unjust enrichment claim in Count III also remains with this court.

The court denies Marisco's request for summary judgment with respect to its failure to pay $148,400 on the final progress payment.  Material questions of fact exist.  (The motion does not separately seek summary judgment with respect to the unjust enrichment claim.)

**II.        BACKGROUND.**

On January 20, 2016, Marisco and GLEC entered into a Dry Dock Construction Agreement.  *See* ECF No. 77-2 (copy of Dry Dock Construction Agreement).  GLEC agreed to build and perform all the work required by the dry dock plans.  Agreement ¶ 1.1, ECF No. 77-2, PageID # 1709.  The completed dry dock was supposed to be delivered by September 30, 2016.  *See* Agreement ¶ 3.1, PageID # 1712.  If GLEC failed to deliver the completed dry dock

by that date, GLEC was to pay Marisco $700 for every day of delay. *See* Agreement ¶ 3.6, PageID # 1713. There is no dispute that GLEC failed to deliver the dry dock on time. In fact, GLEC concedes that it did not deliver the dry dock until May 3, 2017. *See* Decl. of Ping Han Lee ¶ 44, ECF No. 96-1, PageID # 2306. Marisco says that delivery was 212 days late. *See* Decl. of Fred Anawati ¶ 28, ECF No. 77-1, PageID # 1701. Marisco claims $148,400 in liquidated damages ($700 per day times 212 days). *Id.*

Under the terms of the Agreement, Marisco agreed to pay a total of $9 million for the construction and delivery of the dry dock ($1.8 million due immediately, followed by eight progress payments of $900,000 each). Each progress payment came due when an additional 12.5% of the construction of the dry dock was completed. Agreement ¶ 2.3(a), PageID # 1711. Marisco says that the final progress payment billed by GLEC was for $751,600, which, because of the liquidated damages provision, was $148,400 less than the $900,000 set forth in the Agreement. *See* Anawati Decl. ¶ 27, ECF No. 77-1, PageID # 1701; ECF No. 77-15, PageID # 1866 (April 24, 2017, Final Progress Claim of $751,600).

GLEC says that immediately before it sent the $751,600 invoice, it had sent a $900,000 final progress payment invoice to Marisco. *See* Lee Decl. ¶ 46, ECF No. 96-1, PageID # 2306; ECF No. 96-22, PageID # 2445 (April 24, 2017, Final Progress Claim of

$900,000). GLEC says Marisco rejected this invoice and forced GLEC to issue a new invoice for $751,600 if GLEC wanted any portion of the final payment. *See* Lee Decl. ¶ 47, PageID # 2307. On May 15, 2020, GLEC's attorney sent Marisco's attorney a letter stating that acceptance of the $751,600 payment was not a waiver of GLEC's right to collect the remaining $148,400 allegedly owed on the final progress payment. *See* ECF No. 96-24, PageID # 2450. GLEC attached a bill for the remaining $148,400. ECF No. 96-24, PageID # 2454.

On April 24, 2017, GLEC billed Marisco $201,768.99 in connection with Change Order # 1, which Marisco has refused to pay. *See* ECF No. 77-18; Counterclaim ¶ 44, ECF No. 65-1, PageID # 1431. Marisco says that GLEC agreed in section 6.2 of the Agreement to charge Marisco $2847 per ton for the first 700 tons of steel, and to charge the same price for any steel exceeding 700 tons. *See* Anawati Decl. ¶ 31, ECF No. 77-1, PageID # 1702. Marisco says Change Order # 1 improperly included an increase of $170.82 per ton in the cost of steel, bringing the cost to $3017.82 per ton for both the first 700 tons used and the extra 483.01 tons used. Marisco says it paid for all of the steel at the original agreed-upon price of $2847 per ton, meaning that what is in dispute is the increase in price. *Id.* ¶ 32. The numbers are close, but they do not add up exactly (1,183.01 tons x $170.82 per ton = $202,081.77). The bill for $201,768.99 is

$312.78 less than the mathematical total of $202,081.77.  At the hearing, the parties indicated that the amounts were close enough that they had not bothered making any correction to the amount in controversy.

GLEC says that Fred Anawati, on behalf of Marisco, approved an invoice for $1,577,211.24 relating to Change Order # 1, which included the increased price of $3017.82 per ton of steel.  *See* Lee Decl. ¶ 28, ECF No. 96-1, PageID # 2302 ("Marisco agreed to the increased rate for all steel acquired, including the initial 700 tons"); ECF No. 96-12, PageID # 2428 (copy of invoice for Change Order # 1 dated April 10, 2017, with a signature that may be Anawati's on it after the word "Approved").  While the signature on the "Approved" Change Order # 1 appears to be on behalf of Marisco, the record does not clearly establish that it is Anawati's signature.  *Compare* signature on ECF No. 96-12, PageID # 2428 *with* signatures on Agreement, ECF No. 77-2, PageID # 1728, and Certificate of Amount of Payment, ECF No. 96-23, PageID # 2446.  In any event, the detail on the invoice for Change Order # 1 dated April 10, 2017, lists the final price of $1,577,211.24, followed by references to payments of $500,000, $300,000, and $315,442.25, and a request for payment of $260,000. ECF No. 96-12, PageID # 2428.  That invoice provided no detail about the remaining $201,768.99 ($1,577,211.24 minus $500,000, $300,000, $315,442.25, and $260,000 = $201,768.99).  This

$201,768.99 was asked for in a separate invoice dated April 24, 2017, relating to Change Order # 1.  ECF No. 77-18, PageID # 1872.  It is unclear whether, with respect to the invoice dated April 10, 2017, Anawati might have approved only the $260,000 increment.

Invoices for Change Order #s 9, 10, and 11 were sent by GLEC to Marisco on May 3, 2017, the day GLEC says it turned the dry dock over to Marisco.  *See* Anawati Decl. ¶ 25, ECF No. 77-1, PageID # 1701 (indicating the dry dock was turned over on May 3, 2017); and ¶ 34, PageID # 1703 (indicating that Change Order #s 9, 10, and 11 were not presented to Marisco until after work was completed); ECF No. 77-19, PageID # 1873 (Change Order # 9 dated May 3, 2017, for $43,850.95 for formworks, concrete, and rebar installation); ECF No. 77-20, PageID # 1875 (Change Order # 10 dated May 3, 2017, for $23,178.08 for baseplate and grouting work); and ECF No. 77-21, PageID # 1877 (Change Order # 11 dated May 3, 2017, for $275,861.25 for additional formworks, concrete, and rebar work).

GLEC explains that Change Order # 9 related to an increase in curb thickness of one inch.  GLEC says that Marisco's engineer, Ben Zhou of Yee Precast, approved the work underlying Change Order # 9 on February 8, 2017.  *See* Lee Decl. ¶ 40, ECF No. 96-1, PageID # 2305.  On February 7, 2017, Thet Lwin, GLEC's project manager, sent an email to Ben Zhou that stated, "As per

site condition, we need to increase the curb thickness by 1 inch to have enough concrete cover on curb." ECF No. 96-20, PageID #s 2440-41. Zhou responded on February 8, 2017: "The proposal is acceptable to us as long as the stump plates are not shifted." *Id.*, PageID # 2440.

GLEC explains that Change Order # 10 related to additional base plates required by a change in the anchor bolts (Change Order # 6). GLEC says the additional base plates were ordered by BMT, Marisco's agent, after consultation with Zhou. *See* Lee Decl. ¶ 42, ECF No. 96-1, PageID # 2305. On November 26, 2016, Lwin, GLEC's project manager, sent Zhou and Anil Thaper a request to use anchor bolts of 948 to 998MPa tensile strength, rather than 1220MPa. An email on November 28, 2016, then appears to confirm that the tensile strength could be increased. On November 28, 2016, Zhou also responded, "With slightly increased bolt sizes, the base plate bolt holes may or may not need slight modifications (which are not urgent at this point as the base plates will be installed months later)." ECF No. 96-21, PageID #s 2442-43. It is not clear that this demonstrates Marisco's acceptance of the work described in Change Order # 10, although GLEC is claiming that it was BMT, not Zhou, that approved the work.

GLEC explains that Change Order # 11 related to an increase in formworks, rebar, and concrete.  *See* Lee Decl. ¶ 43, ECF No. 96-1, PageID # 2306.

GLEC says the work reflected in Change Order #s 10 and 11 "cover calculations that are typically determined at the end of a project, per industry standard."  *See* Lee Decl. ¶ 45, PageID # 2306.

Count I of GLEC's Counterclaim asserts a breach of contract based on Marisco's failure to pay the $148,400 due on the final progress payment and failure to pay amounts owed on Change Order #s 1 ($201,768.99), 9 ($43,850.85), 10 ($23,178.08), and 11 ($275,861.25).  Count II of GLEC's Counterclaim (now part of Count I) asserts that Marisco breached the implied covenant of good faith and fair dealing by approving change orders but then failing to pay for the extra work covered by the change orders, and by pressuring GLEC to complete the construction of the dry dock in spite of delayed payments.  Count III of GLEC's Counterclaim asserts that Marisco was unjustly enriched by getting the dry dock without having paid for all of it.  *See* ECF No. 65-1.

The Agreement contained several provisions with respect to settling disputes.  Section 16 of the Agreement, for example, concerns "Dispute Resolution" and states:

> **16.1  Reference to a Surveyor.**  The Parties must use the procedure set forth in **Section**

9

2. **[5**[1]**]** for arbitration by an agreed surveyor to resolve disputes over contract administration, materials, and workmanship. The disputes referable to the agreed surveyor under the procedure outlined in **Section 2.5** are: (a) status of work for progress payments under **Section 2.5**; (b) impact of Force Majeure on contract performance under **Section 3.5**; and (c) impact of any change orders on contract Sum and Delivery under **Section 6.**

**16.2   Negotiation; Mediation; Litigation.** For any dispute that may arise out of this Agreement, the Parties are to meet and use their best efforts to resolve the dispute by agreement.  The Parties are to meet to discuss the possibility of a mutually agreed upon procedure to resolve any specific dispute that has arisen.  The procedure may be streamlined or simplified in any manner the parties determine.  If no mutual agreement of the Parties is affected, then the dispute resolution will proceed as follows.  Any dispute that may be referred to a surveyor as provided in **Section 16.1** but cannot be resolved by such reference and good faith efforts of the Parties to resolve such dispute, and any other dispute, controversy, or claim arising out of or relating to this Agreement, including any question regarding breach, termination, or invalidity thereof, is to be resolved by litigation under **Section 18.6**[, which requires litigation in the state or federal courts in Hawaii].

ECF No. 77-2, PageID #s 1723-24.

Section 2.5 of the Agreement states:

**2.5 Notice of Progress Billing. . . .**  Any dispute on whether Work covered by any progress payment is due is to be resolved by

_____

[1]The parties previously agreed that the reference in section 16.1 to section 2.4 is a typographical error and that section 2.5 should have been cited.  The court has therefore changed the reference to section 2.5.

> binding arbitration by a qualified marine surveyor mutually selected by the Parties. The fees of that arbitrator/surveyor are to be borne equally by the Parties.  The Parties intend that such arbitration be done by the arbitrator/surveyor by reviewing and assessing the Work, and that he make his determination summarily, without the necessity of taking testimony or issuing a written or oral opinion.  Owner must make progress payments properly due within 10 days of the due date.

**III.**     **ANALYSIS.**

Before the court are two motions concerning GLEC's Counterclaim.  In the first motion, ECF No. 78, Marisco seeks judgment on the pleadings with respect to Counts II and III of the Counterclaim.  With respect to Count II, Marisco contends that a breach of the implied covenant of good faith and fair dealing cannot support an independent cause of action. Alternatively, Marisco argues that Count II does not plead a plausible claim.  With respect to Count III, Marisco says that the unjust enrichment claim cannot proceed given GLEC's assertion of a separate breach of contract claim based on the same facts. The court grants the motion for judgment on the pleadings with respect to Count II, but denies it with respect to Count III.

In the second motion, ECF No. 76, Marisco seeks summary judgment, arguing that the counts in the Counterclaim must be arbitrated, or that Marisco is entitled to judgment as a matter of law with respect to the Counterclaim.  The court orders the parties to arbitrate the portion of Count I of the Counterclaim

11

relating to change orders.  However, to the extent Count I concerns the $148,000 allegedly due on the final progress payment, Marisco fails to show that the parties agreed to arbitrate that claim.  The entire unjust enrichment claim (Count III) also remains with this court.  The court determines that questions of fact preclude summary judgment on the matters not being referred to arbitration.

### A.   The Motion for Judgment as a Matter of Law is Granted in Part and Denied in Part.

#### 1.   Motion for Judgment on the Pleadings Standard.

Rule 12(c) of the Federal Rules of Civil Procedure states, "After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." The standard governing a Rule 12(c) motion for judgment on the pleadings is "functionally identical" to that governing a Rule 12(b)(6) motion.  *United States ex rel. Caffaso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011); *accord Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) ("Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.").

12

With a Rule 12(c) motion, the allegations of the nonmoving party are accepted as true, while the allegations of the moving party that have been denied are assumed to be false. *See Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989). A court evaluating a Rule 12(c) motion must construe the factual allegations in a complaint in the light most favorable to the nonmoving party. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). Under Rule 12(c), "'Judgment on the pleadings is properly granted when, accepting all factual allegations as true, there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law.'" *Chavez v. United States,* 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Fleming*, 581 F.3d at 925).

> **2.  Judgment on the Pleadings is Granted With Respect to the Implied Covenant of Good Faith and Fair Dealing Claim Asserted in Count II of the Counterclaim.**

With respect to the breach of the implied covenant of good faith and fair dealing claim asserted in Count II of the Counterclaim, Marisco argues that there is no such independent cause of action. Alternatively, Marisco says Count II is insufficiently pled. GLEC says it is asserting a contractual claim for breach of the implied covenant of good faith and fair dealing in a commercial contract. At the hearing, the parties agreed that GLEC's breach of the implied covenant of good faith and fair dealing claim could be viewed as part of the breach of

13

contract claim asserted in Count I of the Counterclaim.  With
that agreement, the court grants judgment on the pleadings in
favor of Marisco with respect to Count II, as there is no need
for a duplicative claim.

Marisco correctly argues that an implied covenant of
good faith and fair dealing claim is not recognized as an
independent claim by Hawaii's Uniform Commercial Code.  Although
section 490:1-304 of the Hawaii Revised Statutes states that
"[e]very contract or duty within this chapter imposes an
obligation of good faith in its performance and enforcement,"
Comment No. 1 to that provision clarifies that it

> does not support an independent cause of
> action for failure to perform or enforce in
> good faith. Rather, this section means that a
> failure to perform or enforce, in good faith,
> a specific duty or obligation under the
> contract, constitutes a breach of that
> contract or makes unavailable, under the
> particular circumstances, a remedial right or
> power.  This distinction makes it clear that
> the doctrine of good faith merely directs a
> court towards interpreting contracts within
> the commercial context in which they are
> created, performed, and enforced, and does
> not create a separate duty of fairness and
> reasonableness which can be independently
> breached.

Haw. Rev. Stat. § 490:1-304, cmt 1.  GLEC, however, says it is
not asserting a good faith and fair dealing claim under Hawaii's
Uniform Commercial Code.  *See* ECF No. 93, PageID #s 2058-59.

Marisco also notes that Hawaii law generally does not
recognize a tortious breach of contract claim, *see Francis v. Lee*

14

*Enterprises, Inc.*, 89 Haw. 234, 971 P.2d 707 (1999), and that,
with respect to contracts, the Hawaii Supreme Court has
recognized the tort of bad faith only in the first- and third-
party insurance context.  *See Best Place*, 82 Haw. 120, 132, 920
P.2d 334, 346 (1996) ("we hold that there is a legal duty,
implied in a first- and third-party insurance contract, that the
insurer must act in good faith in dealing with its insured, and a
breach of that duty of good faith gives rise to an independent
tort cause of action").  *Best Place* grounded that decision in the
"atypical" relationship between the insurer and the insured,
stating:

> Adopting the tort of bad faith is consistent
> with the case law and statutory provisions
> dealing with insurer misconduct in this
> jurisdiction.  In addition, the special
> relationship between insurer and insured is
> . . . atypical, and the adhesionary aspects
> of an insurance contract further justify the
> availability of a tort recovery.  Finally, a
> bad faith cause of action in tort will
> provide the necessary compensation to the
> insured for all damage suffered as a result
> of insurer misconduct.  Without the threat of
> a tort action, insurance companies have
> little incentive to promptly pay proceeds
> rightfully due to their insureds, as they
> stand to lose very little by delaying
> payment.

*Id.* at 132, 920 P.2d at 346.  *Best Place* explained that "the tort
of bad faith is not a tortious breach of contract, but rather a
separate and distinct wrong which results from the breach of a

15

duty imposed as a consequence of the relationship established by contract." *Id.* at 131, 920 P.2d at 345.

However, "Hawaii law generally does not recognize tort claims for breach of good faith or fair dealing outside the insurance context." *See Gold Refinery, LLC v. Aloha Island Gold, LLC*, 2012 WL 518396 at *7 (D. Haw. Feb. 15, 2012). That is, although the Hawaii Supreme Court recognizes a tort of bad faith, which is a breach of the implied covenant of good faith and fair dealing, the Hawaii Supreme Court has not extended that tort beyond the context of insurance. *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Haw. 201, 229, 166 P.3d 961, 990 (2007) ("[T]here is no tort of bad faith outside the context of insurance claims").

GLEC says Count II does not seek tort damages for bad faith conduct with respect to the Agreement. *See* ECF No. 93, PageID #s 2058-59. GLEC says that Count II instead asserts a breach of contract claim based on an alleged breach of a duty to act in good faith with respect to a contract. In Hawaii, the obligation to deal in good faith is a well-established contract principle. "[E]very contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." *Best Place*, 82 Haw. at 123-24, 920 P.2d at 337-38 (citing Restatement (Second) of Contracts § 205 (1979) ("Every contract

16

imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")).

The Hawaii Intermediate Court of Appeals has expressly noted that parties have a duty of good faith and fair dealing while performing contractual obligations.  Such good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Hawaii Leasing v. Klein*, 5 Haw. App. 450, 456, 698 P.2d 309, 313 (App. 1985) (citing Restatement (Second) of Contracts § 205, cmt. a).  "Thus, a party who evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, may be liable for breach of the implied covenant of good faith and fair dealing."  23 *Williston on Contracts* § 63:22 (4th ed.) (quotation marks, alterations, and citation omitted); *see also* Restatement (Second) of Contracts § 205, cmt d ("A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.").

This court has noted that a breach of the implied covenant of good faith and fair dealing may be a claim in the

17

nature of assumpsit.  *See Skanning v. Sorenson*, 2009 WL 5449149, *6 n.4 (D. Haw. Dec. 10, 2009).  *Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.*, 107 Haw. 423, 436, 114 P.3d 929 (Ct. App. 2005), is illustrative.  In *McElroy*, a commercial tenant sued its landlord, arguing in relevant part that the landlord had breached its duty of good faith and fair dealing when the landlord estimated the common area maintenance fee for a building that was being constructed to be $0.25 per square foot per month, but the fee ended up being more than double that.  The landlord sought summary judgment, arguing that the tenant had not shown a breach of a contractual provision in the lease at issue.  The ICA rejected that argument, noting that every contract imposes a duty of good faith and fair dealing on each party and that "'[g]ood faith performance emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"  *McElroy*, 107 Haw. at 436, 114 P.3d at 942 (quoting *Hawaii Leasing v. Klein*, 5 Haw. App. 450, 698 P.2d 309 (1985)).  The ICA ruled that the trial court had not erred by denying the summary judgment motion because there were genuine issues as to whether the landlord had been "faithful to an agreed common purpose and acted consistently with the justified expectations of Plaintiffs by failing to disclose at an earlier date that the CAM fee was significantly higher than the CAM fee estimate."  *McElroy*, 107 Haw. at 437, 114 P.3d at 943.

18

*Television Events & Marketing, Inc. v. Amcon Distribing Co.*, 488 F. Supp. 2d 1071, 1080 (D. Haw. 2006), examined *McElroy* while noting that a party may breach a contract even when the party does not breach an explicit term of the contract.  Like *McElroy*, *Television Events* examined whether a defendant "had been faithful to an agreed common purpose and acted consistently with the justified expectations of the plaintiffs."  *Id.* (quotation marks and citation omitted).  As the Seventh Circuit stated in *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992), the covenant of good faith and fair dealing implied in every contract "guides the construction of explicit terms in an agreement" and "limits the exercise of discretion vested in one of the parties to the contract."

This court turns to examining whether Count II of the Counterclaim sufficiently alleges a contractual breach of the duty of good faith and fair dealing in the Dry Dock Construction Agreement.  Paragraph 72 of the Counterclaim alleges, "The Agreement is a contract that contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the Agreement."  Paragraph 74 of the Counterclaim alleges, "Marisco breached its duty of good faith by insisting on change orders that expanded the scope of work, failing to make timely payments under the Agreement, and pressuring GLEC to complete construction of the

Dry Dock in spite of the delayed payments."  GLEC sufficiently

alleges a breach of implied obligations under the Agreement.

> Section 6.1 of the Dry Dock Agreement states:

> Owner . . . may order Changes in the Work
> consisting of additions, deletions, or
> modifications.  All such Changes in the Work
> must be authorized by written Change Order
> signed by Owner stating any agreed
> adjustments to the Contract Sum, if any, and
> the date for Substantial Completion.  The
> cost or credit to Owner from a Change in Work
> must be determined by mutual agreement
> between Contractor and Owner.  If agreement
> cannot be reached, then it must be determined
> by an arbitrator/surveyor . . . .

ECF No. 1-1, PageID # 62.  Paragraph 74 of the Counterclaim

alleges that Marisco failed to act in good faith with respect to

change orders by expanding the scope of the work through change

orders but failing to pay for the expanded work.  Marisco thereby

allegedly failed to act in accordance with GLEC's justified

expectations.  The covenant of good faith and fair dealing

implied in every contract "guides the construction of explicit

terms in an agreement," *Beraha*, 956 F.2d at 1443, and Marisco had

to comply in good faith with the change order provisions in

section 6.1.  The Counterclaim appears to this court to allege a

viable breach of contract claim based on an implied duty of good

faith arising out of section 6.1 of the Agreement.  *See Lynch v.*

*Fed. Nat'l Mortg. Ass'n*, 2016 WL 6776283, at *9 (D. Haw. Nov. 15,

2016) ("Breach of the implied covenant of good faith is not its

own claim but merely part of a breach of contract analysis.").

Any claim that Marisco has simply failed to make payments expressly called for under the Agreement is already stated in the normal breach of contract claim asserted in Count I of the Counterclaim.  In Count II, GLEC appears to alleging something different, i.e., that Marisco breached the contract by adding to the scope of work it was demanding of GLEC without paying for that additional work.  This court is not reading Count II as allowing tort damages, but it is reading Count II as actually subsumed within Count 1.  The court grants judgment on the pleadings with respect to Count II of the Counterclaim in favor of Marisco insofar as Marisco seeks dismissal of an independent claim relating to the duty of good faith and fair dealing, but such a claim may be litigated as part of Count I.

### 3.   GLEC May Plead Unjust Enrichment As An Alternative Claim.

Count III of the Counterclaim asserts an unjust enrichment claim, which the Hawaii Supreme Court has noted "is not clearly defined in either the Hawai`i Revised Statutes or our jurisprudence." *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 502-03, 100 P.3d 60, 72 (2004).  The Hawaii Supreme Court has explained:

> It is a truism that a person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, or in any way adds to the other's security or advantage.  One who receives a benefit is of course enriched, and he would be unjustly

21

> enriched if its retention would be unjust.
> And it is axiomatic that a person who has
> been unjustly enriched at the expense of
> another is required to make restitution to
> the other.  We realize unjust enrichment is a
> broad and imprecise term defying definition.
> But in deciding whether there should be
> restitution here, we are guided by the
> underlying conception of restitution, the
> prevention of injustice.

*Small v. Badenhop*, 67 Haw. 626, 635-36, 701 P.2d 647, 654 (1985)

(alterations, quotation marks, and citations omitted).  In other

words, "a claim for unjust enrichment requires only that a

plaintiff prove that he or she conferred a benefit upon the

opposing party and that the retention of that benefit would be

unjust." *Durette*, 105 Haw. at 504, 100 P.3d at 74 (alterations,

quotation marks, and citation omitted); *Yoneji v. Yoneji*, 136

Haw. 11, 18, 354 P.3d 1160, 1167 (Ct. App. 2015) (same).

This court has stated that, to bring an unjust

enrichment claim, a plaintiff must allege two elements:

"(a) receipt of a benefit without adequate legal basis by

Defendants; and (b) unjust retention of that benefit at the

expense of Plaintiffs.'" *Philadelphia Indem. Ins. Co. v. Ohana

Control Sys., Inc.*, 289 F. Supp. 3d 1141, 1151 (D. Haw. 2018)

(quoting *Porter v. Hu*, 116 Haw. 42, 54, 169 P.3d 994, 1005 (Ct.

App. 2007)); *Adwalls Media, LLC v. Ad Walls, LLC*, 2015 WL 419664,

at *10 (D. Haw. Jan. 30, 2015) (quoting *Porter*, 116 Haw. at 54,

169 P.3d at 1005).

Additionally, for an unjust enrichment claim to proceed, there must be an "absence of an adequate remedy at law." *Porter*, 116 Haw. at 55, 169 P.3d at 1007 (quotation marks and citation omitted).  It is well settled that equitable remedies such as unjust enrichment "are not available when an express contract exists between the parties concerning the same subject matter." *Soule v. Hilton Worldwide, Inc.*, 1 F. Supp. 3d 1084, 1102 (D. Haw. 2014).  "Where the parties to a contract have bargained for a particular set of rights and obligations, all claims involving those express rights and obligations properly lie in contract law and not in equity." *Id.*  This means that, "[t]o the extent Plaintiff's theory of liability is premised on an express contract or agreement . . . , equitable remedies are not available to Plaintiff." *Id.* at 1103.  The "purpose of the rule is to guard against the use of equitable remedies to distort a negotiated arrangement by broadening the scope of the contract." *Id.* (quotation marks and citation omitted).

Marisco seeks judgment on the pleadings with respect to the unjust enrichment claim asserted in Count III of the Counterclaim, arguing that the equitable unjust enrichment claim cannot stand in the face of legal remedies for alleged breaches of the Dry Dock Construction Agreement.  However, at the pleading stage, a plaintiff is generally entitled to pursue alternative

theories.  *See Maeda v. Pinnacle Foods Inc.*, 390 F. Supp. 3d 1231, 1258 (D. Haw. 2019).

> The general rule is that there cannot be an express contract and an implied contract for the same thing at the same time.  However, under the modern rule, a plaintiff generally is not precluded from pleading both the existence of a contract and unjust-enrichment theories.  These theories should be pleaded in the alternative, because the fact finder may find that no contract exists and may still award damages on the theory of unjust enrichment.

66 Am. Jur. 2d Restitution and Implied Contracts § 160.

> Count III states:
>
> 79. Marisco's concerted actions resulted in GLEC's delivery of the Dry Dock to Marisco without receipt of all payments due under the Agreement, and conferred a benefit upon Marisco—to GLEC's detriment.
>
> 80. Marisco's retention of the benefit is unjust.
>
> 81. Marisco's conduct is contrary to the fundamental principles of equity and good conscience.  GLEC is entitled to the payment amounts under the Agreement and the change orders, or disgorgement of the benefits Marisco wrongfully enjoyed, all in amounts to be proven at trial.

ECF No. 65-1, PageID # 1437.

To the extent the unjust enrichment claim is premised on GLEC's delivery of the dry dock to Marisco without receipt of all payments due under the Agreement (the outstanding $148,400), it may well be asserting, as Marisco contends, an equitable claim for the legal remedy already sought in the breach of contract

24

claim asserted in Count I of the Counterclaim.  However, this possibility does not warrant judgment on the pleadings with respect to the equitable claim at this stage of the case.

If GLEC prevails on its breach of contract claim in Count I of the Counterclaim, the court agrees with Marisco that GLEC is not entitled to a duplicative award relating to its unjust enrichment claim in Count III of the Counterclaim.  If, however, GLEC loses on all or part of its breach of contract claim, GLEC may or may not have had an adequate remedy at law such that GLEC may not proceed with its unjust enrichment claim.

This court cannot presently foresee all of the reasons that GLEC might fail with respect to its breach of contract claim.  Possibly, those reasons might reflect the absence of an adequate remedy at law.  For example, Marisco claims a right to offset $148,400 from the final progress payment, calculating 212 days of delay multiplied by liquidated damages of $700 per day. A jury might find that Marisco did not breach the Agreement by offsetting that amount.  However, there is a dispute about whether Marisco was responsible for part of the delay.  Whether fault for the delay will be apportioned at trial is unclear at this point.  Similarly problematic is the dispute regarding Change Order #s 1, 9, 10, and 11.  Given the uncertainty as to what will occur, this court allows GLEC to proceed with alternative remedies for now.

B.   **The Motion for Summary Judgment is Granted in Part.**

In the second motion, ECF No. 76, Marisco seeks summary judgment on the ground that GLEC's claims must be arbitrated, or that, on the merits, Marisco is entitled to judgment as a matter of law.   The court grants this motion in part and denies it in part.

### 1.   Summary Judgment Standard.

This court set forth the summary judgment standard in its order of June 25, 2020.   *See* ECF No. 109, PageID #s 2975-78. That standard is incorporated by reference.

### 2.   The Federal Arbitration Act Requires Arbitration of Only GLEC's Breach of Contract Claim Arising Out of Marisco's Alleged Failure to Pay Invoices for Change Order #s 1, 9, 10, and 11.

The parties previously agreed that the Federal Arbitration Act ("FAA") governs whether arbitration is required for certain claims arising out of the Dry Dock Agreement.   See *Marisco, Ltd. v. GL Eng'g & Constr. Pte., Ltd.*, 2019 WL 4889398, at *3 (D. Haw. Oct. 3, 2019).   As this court has already noted:

> Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.   "The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208, an amendment to the Federal Arbitration Act, requires enforcement of arbitration clauses in international contracts unless the clause is null and void." *Aasma v. Am. S.S. Owners*

26

*Mut. Prot. & Indem. Ass'n, Inc.*, 95 F.3d 400, 405 (6th Cir. 1996).

The purpose of the FAA is to advance the federal policy favoring arbitration. *See Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008). Another "overarching purpose of the FAA is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *See Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (quotation marks, citation, and alterations omitted). The FAA's provisions therefore reflect a "liberal federal policy favoring arbitration." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

The FAA requires courts to "enforce the terms of arbitration agreements like other contracts." *Lowden*, 512 F.3d at 1220; *see also Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1091 (9th Cir. 2018). A court interpreting an arbitration agreement must resolve ambiguities as to the scope of the arbitration clause in favor of arbitration. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-85 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ."); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1018 (9th Cir. 2016). This court applies "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Boardman*, 822 F.3d at 1018 (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)).

In determining whether to compel a party to arbitrate, a district court may not review the merits of the dispute.  Rather, the court's role under the FAA is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Munro*, 896 F.3d at 1091 (quoting *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008)).  When a court determines that an arbitration agreement does not encompass the parties' dispute, the court cannot compel the parties to arbitrate the dispute under the agreement.  *See In re Holl*, 925 F.3d 1076, 1083 (9th Cir. 2019) ("a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").  On the other hand, when a court determines that a valid arbitration agreement encompasses the parties' dispute, the FAA requires the court to enforce the arbitration agreement according to its terms.  *See Countrywide Home Loans, Inc., v. Mortgage Guar. Ins. Corp.*, 642 F.3d 849, 854 (9th Cir. 2011) (noting that the FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed").

All parties agree that the arbitration clause contained in the Dry Dock Construction Agreement is valid and enforceable and should be construed under the FAA.  This motion therefore turns on whether the parties' agreement to arbitrate encompasses any or all claims asserted in the First Amended Verified Complaint.

*Id.* at *3-*4.

Marisco contends that GLEC's Counterclaim must be arbitrated.  This court therefore compares GLEC's claims to the relevant arbitration language in the Dry Dock Construction Agreement, which states:

> **16.1  Reference to a Surveyor.**  The Parties must use the procedure set forth in Section 2.[5] for arbitration by an agreed surveyor to resolve disputes over contract administration, materials, and workmanship. The disputes referable to the agreed surveyor under the procedure outlined in Section 2.5 are: (a) status of work for progress payments under Section 2.5; (b) impact of Force Majeure on contract performance under Section 3.5; and (c) impact of any change orders on contract Sum and Delivery under Section 6.

A number of other provisions in the Agreement are also relevant.

Section 2.5 of the Dry Dock Agreement states:

> **2.5 Notice of Progress Billing.** . . .  Any dispute on whether Work covered by any progress payment is due is to be resolved by binding arbitration by a qualified marine surveyor mutually selected by the Parties. The fees of that arbitrator/surveyor are to be borne equally by the Parties.  The Parties intend that such arbitration be done by the arbitrator/surveyor by reviewing and assessing the Work, and that he make his determination summarily, without the necessity of taking testimony or issuing a written or oral opinion.  Owner must make progress payments properly due within 10 days of the due date.

In addition, section 6.1 of the Dry Dock Agreement states:

> **Written Change Orders Required.**  Owner . . . may order Changes in the Work consisting of additions, deletions, or modifications.  All such Changes in the Work must be authorized by written Change Order signed by Owner stating any agreed adjustments to the Contract Sum, if any, and the date for Substantial Completion.  The cost or credit to Owner from a Change in Work must be determined by mutual agreement between Contractor and Owner.  If agreement cannot be reached, then it must be determined by an

     arbitrator/surveyor under the provisions of
     **Section 16.1.**

ECF No. 1-1, PageID # 62.

    Paragraph 42 of the Counterclaim alleges that "Marisco unilaterally withheld $148,400 from the final progress payment under the Agreement." ECF No. 65-1, PageID # 1431. Marisco says that amount was withheld because GLEC delivered the dry dock 212 days late and, under the Agreement, GLEC owed Marisco $700 in liquidated damages for every day the dry dock was delivered late ($700 per day x 212 days = $148,400). *See* Decl. of Fred Anawati ¶ 28, ECF No. 77-1, PageID # 1701. Paragraphs 44 to 47 of the Counterclaim allege that Marisco failed to pay for Change Order #s 1 ($201,768.99), 9 ($43,850.85), 10 ($23,178.08), and 11 (275,861.25). These Change Orders totaled $544,659.17. *See* ECF No. 65-1, PageID #s 1431-32.

    Count I of the Counterclaim asserts a breach of contract in the form of Marisco's failure to pay the $148,400 allegedly owed on the final progress payment and $544,659.17 allegedly owed for Change Order #s 1, 9, 10, and 11. *See* ECF No. 65-1, PageID # 1435.

    Count III of the Counterclaim asserts unjust enrichment relating to Marisco's receipt of the dry dock, allegedly without having paid everything owed. *See* ECF No. 65-1, PageID # 1437.

    To the extent Count I of the Counterclaim is based on Marisco's alleged failure to pay the full amount of the last

progress payment under the Agreement, it is not subject to arbitration, as there is no clear agreement to arbitrate it. Under section 2.3a of the Agreement, Marisco agreed to pay a total of $9 million for the construction of the dry dock, with $1.8 million due immediately, followed by eight progress payments of $900,000 each.  Each progress payment was due upon completion of 12.5% of the construction of the dry dock.  Agreement ¶ 2.3(a), PageID # 1711.  Section 16.1 of the Agreement requires arbitration of "disputes over contract administration, materials, and workmanship," with the caveat that "disputes referable to the agreed surveyor under the procedure outlined in Section 2.5" include "status of work for progress payments under Section 2.5." Section 2.5 states that "[a]ny dispute on whether Work covered by any progress payment is due [sic] is to be resolved by binding arbitration."  Section 2.5 further requires that "such arbitration be done by the arbitrator/surveyor by reviewing and assessing the Work, and that he make his determination summarily, without the necessity of taking testimony or issuing a written or oral opinion."

In other words, with respect to progress payments, the parties appear to have contemplated arbitration of disputes as to whether the state of construction triggered Marisco's progress payment obligations.  A progress payment was due whenever GLEC constructed 12.5% of the dry dock.  There is no dispute that GLEC delivered the dry dock to Marisco, thereby triggering the

obligation to pay the final progress payment.  Accordingly, any claim arising out of nonpayment of the full amount of the last progress payment does not appear to involve a determination of whether the "status of work" triggered any payment obligation. No arbitrator/surveyor needs to assess whether GLEC's work had proceeded sufficiently to trigger Marisco's payment obligation.

To the extent GLEC's breach of contract claim is based on Marisco's alleged failure to pay amounts due on change orders, however, those claims must be arbitrated.  Section 6.1 of the Dry Dock Agreement states, "Owner . . . may order Changes in the Work consisting of additions, deletions, or modifications."  It further states that all such Changes "must be authorized by written Change Order signed by Owner stating any agreed adjustments to the Contract Sum, if any, and the date for Substantial Completion."  It provides that the cost of a change order "must be determined by mutual agreement between Contractor and Owner.  If agreement cannot be reached, then it must be determined by an arbitrator/surveyor under the provisions of **Section 16.1.**"

Marisco's alleged failure to pay $201,768.99 for Change Order # 1 is the result of a dispute as to a cost.  Marisco says that, in section 6.2 of the Agreement, GLEC agreed to charge Marisco the same price for steel used in excess of 700 tons that it charged for the first 700 tons of steel, $2,847 per ton.  *See*

Anawati Decl. ¶ 31, ECF No. 77-1, PageID # 1702.  Marisco says Change Order # 1 improperly increased the cost per ton by $170.82 to $3,017.82 for both the first 700 tons of steel used and the additional 483.01 tons of steel used.  *Id.* ¶ 32.  GLEC, on the other hand, says that Fred Anawati, on behalf of Marisco, approved the $1,577,211.24 price of Change Order # 1, and that that figure included the steel price increase.  *See* Lee Decl. ¶ 28, ECF No. 96-1, PageID # 2302 ("Marisco agreed to the increased rate for all steel acquired, including the initial 700 tons"); ECF No. 96-12, PageID # 2428 (copy of invoice for Change Order # 1 dated April 10, 2017, with a signature that may be Anawati's on it after the word "Approved").  The dispute concerning the cost of Change Order # 1 is arbitrable under section 6.1 of the Dry Dock Agreement.

Marisco says it did not approve Change Orders #s 9, 10, and 11 or authorize the work allegedly at issue in those change orders.  *See* Anawati Decl. ¶ 35, ECF No. 77-1, PageID # 1703; ECF No. 77-19, PageID # 1873 (Change Order # 9 dated May 3, 2017, for $43,850.95 for formworks, concrete, and rebar installation); ECF No. 77-20, PageID # 1875 (Change Order # 10 dated May 3, 2017, for $23,178.08 for baseplate and grouting work); and ECF No. 77-21, PageID # 1877 (Change Order # 11 dated May 3, 2017, for $275,861.25 for additional formworks, concrete, and rebar work).

Any dispute about the amount payable for a written change order must be arbitrated under section 6.1 of the Dry Dock Agreement, which states, "The cost or credit to Owner from a Change in Work must be determined by mutual agreement between Contractor and Owner.  If agreement cannot be reached, then it must be determined by an arbitrator/surveyor under the provisions of **Section 16.1**."

GLEC argues that the cost of the change orders should not be arbitrated because the dry dock has already been delivered and because the arbitration provision was meant to apply to change orders during only the construction of the dry dock.  *See* ECF No. ECF No. 97, PageID # 2533.  According to GLEC, Marisco's earlier opposition to GLEC's motion to compel arbitration admitted that the arbitration was supposed to be "a quick means to resolve disputes during the construction that would impact both the timing and the costs of building the Dry Dock."  *See* ECF No. 14, PageID # 508.

Change Order # 1 was allegedly approved by Anawati on or about April 10, 2017, before the dry dock was delivered to Marisco and therefore at least arguably during construction.  Although Change Order #s 9, 10, and 11 were billed to Marisco on the day GLEC delivered the dry dock, each of those change orders pertained to work supposedly done before delivery.  *See* ECF No. 77-19, PageID #s 1873-78.  Had GLEC provided Marisco with the

34

bills for the change orders when or before the work covered by each change order was done, the parties could have agreed on the cost or had an arbitrator/surveyor decide on the cost before delivery of the dry dock. GLEC's submission of written "pricing proposals" at the time it delivered the dry dock cannot be a means of evading the arbitration process. Waiting until after completion of the dry dock to tell Marisco the dollar amounts relating to change orders may have affected the parties' ability to resolve disputes during construction quickly.

GLEC argues that the matters reflected in Change Order #s 10 and 11 "cover calculations that are typically determined at the end of a project, per industry standard." *See* Lee Decl. ¶ 45, PageID # 2306. However, it is unclear on the present record that Lee has the requisite personal knowledge or expertise to make such a statement. Nor is it clear that Lee is correct on this point. Change Order # 10 relates to additional base plates required by a change in the anchor bolts (Change Order # 6). *See* Lee Decl. ¶ 42, ECF No. 96-1, PageID # 2305. Change Order # 11 relates to an increase in formworks, rebar, and concrete. *See* Lee Decl. ¶ 43, ECF No. 96-1, PageID # 2306. As contemplated by Section 6.1 of the Agreement, these changes to specifications for the floating dry dock may well be the types of items that would typically be agreed to during construction. Even if Lee is correct in asserting that these

35

types of matters are "typically determined at the end of a project," he does not define "the end" as being synonymous with completion and delivery of a project.

The court therefore orders the parties to arbitrate Count I the Counterclaim to the extent it is based on Change Order #s 1, 9, 10, and 11.

The court declines to order the parties to arbitrate any part of the unjust enrichment claim in Count III of the Counterclaim.  That unjust enrichment claim only proceeds if GLEC lacks an adequate remedy at law.  If it is ultimately determined that there is no cognizable change order in dispute, it might turn out that GLEC will have no adequate remedy at law. Of course, the parties may want to agree to have an arbitrator decide the unjust enrichment claim relating to Change Order #s 1, 9, 10, and 11.

### 3. Questions of Fact Preclude Summary Judgment With Respect to the Claim for Nonpayment of $148,400.

Marisco alternatively argues that, if this court declines to send GLEC's claims to arbitration, Marisco is entitled to summary judgment on those claims.  Because the court retains the portion of Count I asserting a breach of contract claim with respect to Marisco's alleged failure to pay $148,400 on the final progress payment, the court turns to whether Marisco is entitled to summary judgment on that remaining claim.

The court rules that questions of fact preclude the remainder of Marisco's motion for summary judgment.  In seeking summary judgment with respect to the disputed $148,400 of the final progress payment, Marisco argues that it was entitled to an offset equal to the liquidated damages it says GLEC owed for the late delivery of the dry dock.  However, it is not clear which party was responsible for which of the 212 days of delay.  That factual issue prevents Marisco from establishing as a matter of law that it was entitled to offset $148,400 from the final progress payment.

Section 3.6 of the Agreement states, "If Contractor fails to deliver the Dry Dock before or on the Delivery Date, then Contractor agrees to pay owner as liquidated damages U.S. $700 per day."  ECF No. 77-2, PageID # 1713.  GLEC agreed "that liquidated damages of $700/day is appropriate, reasonable, and enforceable."  ECF No. 97, PageID # 2540.  However, GLEC argues that Marisco itself caused delays.  In other words, GLEC contends that Marisco was not entitled to an offset based on liquidated damages for the full 212 days of delay.  *See Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 272, 506 P.2d 9, 12 (1973) ("The general rule is that where a person by his own act makes impossible the performance or the happening of a condition such nonperformance should not relieve him from his obligation under a contract."); *Ikeoka v. Kong*, 47 Haw. 220, 228, 386 P.2d 855,

860 (1963) ("If a promisor himself is the cause of the failure
of performance of a condition upon which his own liability
depends, he cannot take advantage of the failure" (quotation
marks, alterations, and citation omitted)); *Kalinowski v. Yeh*, 9
Haw. App. 473, 478, 847 P.2d 673, 677 (1993) ("it is
well-recognized that no person should profit by his or her own
wrong.  The principle is expressed in the rule that no person
can defend against contractual liability on grounds of a
condition precedent when he or she is responsible for that
condition precedent not being complied with." (quotation marks,
alterations, and citation omitted)).

        In *Associated Engineers & Contractors, Inc. v. State*,
58 Haw. 187, 567 P.2d 397 (1977), the Hawaii Supreme Court
examined a liquidated damages provision providing for $500 in
liquidated damages to be paid to the State of Hawaii for every
day a construction project was late.  The trial court found that
the project was 343 days late, but did not award liquidated
damages for 35 of those days because 35 days of delay were
caused by the State.  On appeal, the State argued that the 35
days should not have been excluded in computing liquidated
damages.  The Hawaii Supreme Court rejected that argument,
determining that, because the State was responsible for 35 days
of delay, it was not entitled to liquidated damages for those 35

days.  *Id.* at 204-05, 567 P.2d at 410.  *Associated Engineers & Contractors* is instructive here.

        While Marisco argues that it is entitled to 212 days' worth of liquidated damages, there is a question of fact as to whether Marisco is responsible for any of that delay.  GLEC's expert opines that, of the 214 days of delay (he counts 214 days, not 212), 190 days of delay may be attributable to Marisco and only 24 days of delay may be attributable to GLEC.  *See* Expert Delay Report by Rohit Singhal ¶ 4.9, ECF No. 96-25, PageID # 2496.  Marisco says this court should disregard the expert report because, among other things, it was not signed under penalty of perjury.  *See* ECF No. 100, PageID #s 2585-86. In ruling on the present summary judgment motion, this court does not rely on Singhal's expert report, but instead on the facts that appear in the record independent of it.[2]  Those asserted facts go to matters that may be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("[W]e need not decide whether the diary itself is admissible.  It would be sufficient if the contents of the diary are admissible at trial, even if the diary itself may be inadmissible.  At the

_____

        [2]On June 25, 2020, GLEC filed a motion seeking leave to supplement Singhal's expert report with a declaration authenticating it and with a statement of his compensation.  That motion is granted without waiting for an opposition, as the court does not want to delay ruling on the substantive motions, is not relying on any expert opinion, and makes no determination as to Singhal's credibility.

summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents.").

While Marisco has a point in arguing that Singhal should have attached to his expert report the material on which he relied, *see* ECF No. 100, PageID #s 2586, that point goes only to whether this court should consider Singhal's opinion, not to whether this court may consider evidence in the record separate from any Singhal report.  For example, even if Singhal himself is not ultimately a trial witness, the record already includes a concession by Marisco that there were delays in delivery of the paint.  Marisco contends that those delays did not affect the delivery of the dry dock, but that assertion on its own is insufficient to establish that GLEC was responsible for all of the delay.  *See* ECF No. 101-24, PageID #s 2817-18 (acknowledging delays in paint procurement, but stating that those delays did not delay delivery of the dry dock).  Who caused a delay is exactly the kind of factual question that must be decided at trial, not on a motion for summary judgment.  Because this court is left with an issue of fact as to whether Marisco is entitled to offset the full amount of $148,400, the court denies Marisco's motion for summary judgment to the extent it seeks an offset for 212 days of liquidated damages.

4.    **Summary Judgment is Denied With Respect to the Change Order Claims Being Referred to Arbitration and to the Entire Unjust Enrichment Claim.**

Because this court is sending the breach of contract claim based on the change orders to arbitration, this court does not reach the merits of that matter.  Marisco offers no separate argument with respect to the unjust enrichment claim.

**IV.    CONCLUSION.**

The court grants Marisco's motion for judgment on the pleadings with respect to the breach of the duty of good faith and fair dealing claim asserted in Count II of the Counterclaim, as that claim is already part of the breach of contract claim asserted in Count I.  In all other respects, Marisco's motion for judgment on the pleadings is denied.

The court grants Marisco's motion for summary judgment, to the extent it seeks to compel arbitration of the portion of GLEC's breach of contract claim pertaining to Change Order #s 1, 9, 10, and 11.  Because that portion of the breach of contract claim must be arbitrated, this court does not reach the merits of that matter.

The court declines to compel arbitration of the portion of the breach of contract claim pertaining to $148,400 allegedly due on the final progress payment.  The court also denies the motion for summary judgment on the merits with respect to the $148,400 allegedly due on the final progress

41

payment, given questions of fact as to which party was responsible for delays.  Summary judgment is denied with respect to the unjust enrichment claim.

The court stays the portion of the unjust enrichment claim arising out of work underlying the change orders pending resolution of the change order disputes in arbitration.  Whether other matters should be stayed is a subject the parties should confer about before seeking action by this court.

The following table summarizes what remains of the Counterclaim:

|  | Based on $148,400 Allegedly Due on Final Progress Payment | Based on Change Orders |
|---|---|---|
| Count I (Breach of Contract) | Remains for adjudication by court | Referred to arbitration. |
| Count II (Breach of Implied Covenant of Good Faith and Fair Dealing) | Judgment on the pleadings granted (Count II subsumed within Count I) | Judgment on the pleadings granted (Count II subsumed within Count I) |
| Count III (Unjust Enrichment) | Remains for adjudication by court | Remains for adjudication, but stayed pending arbitration of portion of breach of contract claim relating to change orders |

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 26, 2020.



                   /s/ Susan Oki Mollway
                  Susan Oki Mollway
                  United States District Judge


Marisco, Ltd. v. GL Engineering & Constr. PTE, Ltd., Civ No. 18-00211 SOM/RT, ORDER
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR JUDGMENT ON THE
PLEADINGS (ECF NO. 78) AND MOTION FOR SUMMARY JUDGMENT (ECF NO. 76)